STATE OF NORTH CAROLINA v. LLOYD PHILLIP GAMBRELL

No. 363A84

(Filed 29 August 1986)

**Constitutional Law § 31 — sanity at time of offense — significant factor at trial — defendant entitled to assistance of psychiatrist**

When a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the State is required to provide access to a psychiatrist's assistance on this issue. Defendant made such a showing, though there was some evidence to the contrary, where he offered evidence that physicians at a hospital, 10 weeks after defendant was placed in custody, determined that he was then in need of psychiatric care, treatment and examination; he appeared at that time to be comatose; defendant had been unable to speak cogently with his counsel; he was incapable of responding to questions posed to him in open court; on admission at Dorothea Dix initial professional impressions were that he suffered from "an acute psychosis, probably schizophrenic in type"; defendant was treated therapeutically with psychotropic drugs which were prescribed for him upon his discharge; one of the doctors at Dix recommended that defendant be followed either at the mental health center or by the jail physician after his discharge; defendant's version of the crime as recited in the hospital summary was totally different from actual events; and defendant had a family history of depression and mental illness.

BEFORE *Seay, J.*, presiding at the 11 June 1984 Criminal Session of Superior Court, FORSYTH County, defendant was convicted of first degree murder. Following a sentencing hearing held pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death. From judgment imposing a sentence of death, defendant appeals as a matter of right. N.C.G.S. § 7A-27(a) (1981 and Cum. Supp. 1985).

*Lacy H. Thornburg, Attorney General, by David Roy Blackwell and Joan H. Byers, Assistant Attorneys General, for the state.*

*David B. Hough, for defendant appellant.*

EXUM, Justice.

Defendant's appeal presents a number of assignments of error. We find his assignment directed to the trial court's denial of his motion to be furnished a psychiatrist to assist in his defense is dispositive of the appeal. We hold the court erred in denying this motion and the error entitles defendant to a new trial.

On 8 November 1983 defendant was arrested and placed in custody for the 4 November 1983 murder of Thomas Edward Burke. He was indicted on 9 January 1984. According to evidence later introduced at defendant's trial Burke was defendant's supervisor at Leinbach Machinery Company in Winston-Salem. On 3 November 1983 Burke questioned defendant about defendant's absenteeism. Burke asked defendant if he disliked working at Leinbach, whereupon defendant stormed out of the room angrily and slammed the door. At 8:30 a.m. on 4 November 1983 defendant entered Burke's office, stated "I have the answer to your question," and, with a sawed-off shotgun, shot Burke in the head, fatally wounding him.

At the guilt-innocence phase of the trial defendant presented no evidence, and the jury found him guilty of first degree murder.

At the sentencing phase of the trial the state offered evidence that defendant had entered a plea of guilty to federal bank robbery in 1977. Defendant offered evidence, including his own testimony, which tended to show that he had led a deprived and harsh childhood. Upon reaching adulthood the defendant married. However, during the marriage he suffered severe emotional prob-

lems. He would often become depressed and despondent. This depression led to bouts of alcohol and drug abuse. Eventually the defendant lost his job and separated from his wife. Shortly thereafter he robbed a federal bank. He turned himself in to the authorities and subsequently pled guilty to the offense.

While in prison the defendant completed his high school education and took several automotive training courses. He also joined the United States Jaycees. Defendant was once disciplined by being placed in solitary confinement. In prison defendant received medicinal, psychiatric therapy.

Upon his release from prison the defendant secured employment with Leinbach Machinery Company through his probation officer. The defendant continued to suffer from depression after his release from prison. His mental and emotional problems were further exacerbated by problems with his mentally ill sister and difficulties at work.

Based upon the evidence introduced during the sentencing phase of the trial, the trial court submitted one aggravating circumstance: that "defendant had been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3). The trial court also submitted eight mitigating circumstances.[1] The jury found the existence of the ag-

---

1. These were:

"(1) This murder was committed while Lloyd Phillip Gambrell was under the influence of mental or emotional disturbance.

"(2) The capacity of Lloyd Phillip Gambrell to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

"(3) Lloyd Phillip Gambrell was a loving and caring father to his natural daughter and to his stepchildren.

"(4) That during the period 1977 through 1981 the defendant completed certain courses of study.

"(5) Until about two or three weeks before November 4, 1983, Lloyd Phillip Gambrell had been considered a good worker by his supervisor, the deceased.

"(6) During the bank robbery in 1977, no individuals were in any way harmed by Lloyd Phillip Gambrell.

gravating circumstance and the existence of one or more of the mitigating circumstances. The jury went on to find that the mitigating circumstances were insufficient to outweigh the aggravating circumstance and that the aggravating circumstance was sufficiently substantial to call for the imposition of the death penalty, when considered with the mitigating circumstances found. The jury returned a recommendation that the defendant be sentenced to death, and the trial court entered judgment accordingly.

I.

Defendant assigns as error the trial court's denial of his pretrial motion for the appointment of a psychiatrist to assist in his defense. We find merit in this assignment.

Following defendant's indictment for murder on 9 January 1984, his counsel orally moved the court on 16 January that the defendant be committed to a state mental facility for observation and treatment to ascertain whether he had the capacity to proceed with the trial. The trial court found that defendant had been examined that morning by physicians at Forsyth County Memorial Hospital and found to be in need of psychiatric care, treatment, and examination. Defendant had appeared comatose and had been unable to speak cogently with his attorney. In open court defendant seemed incapable of responding to questions posed to him. The trial court then concluded and ordered that the defendant should be sent to Dorothea Dix Hospital for observation and treatment to determine his capacity to proceed with trial.

Defendant was admitted to Dorothea Dix Hospital on 16 January 1984 where he remained until his discharge on 27 February 1984.

On 9 March 1984, the defendant moved in writing that the trial court appoint Dr. Selwyn Rose, M.D., a psychiatrist, and Dr. Steven Bradbard, Ph.D., a psychologist, to "independently evaluate and assess the defendant's mental and emotional capabilities

"(7) During the bank robbery in 1977, no shots were fired by Lloyd Phillip Gambrell or anyone else involved in the said situation.

"(8) Any other circumstances arising from the evidence which the jury deems to have mitigating value."

at the time of" the alleged murder. Defendant's motion asserted that defendant has "in the past suffered from serious mental and emotional illnesses." The motion also asserted that defendant's "mental and emotional status at the time of the alleged capital offense is of paramount importance for use in the defendant's defense and for possible use in establishing a mitigating factor in the event a jury is called upon to recommend a sentence." Finally the motion asserted that without the appointment of a forensic psychiatrist and an assisting psychologist to evaluate defendant's mental and emotional status, defendant because of his indigency "will be unable to properly defend himself against the said capital charges."

In support of this motion for psychiatric assistance, defendant presented the discharge summary and psychiatric evaluation of defendant prepared by Dr. J. D. McRee at Dorothea Dix Hospital and dated 27 February 1984. According to this document defendant's chief complaint upon admission was "I've been hearing and seeing things." "In appearance he was considered a catatonic black male." His speech was slow "with some degree of blocking," and his mood "was considered flat." His thinking was "considered as poor." Defendant suffered from auditory and visual hallucinations and delusions under which he stated "there were beeping objects in the sky that were controlling his mind." His concentration, memory, intellectual functions, judgment and insight were described as poor. His orientation was only to name, and he could not remember his birthday. Dr. McRee's impression on admission was that defendant suffered from "an acute psychosis, probably schizophrenic in type." Psychological testing indicated defendant was experiencing unusually high levels of stress, depression, anxiety, "somatic concerns," and feelings of distrustfulness. Testing did not "suggest a psychotic disorder."

The evaluation also included a brief recitation of the defendant's personal history, including references to a history of depression and mental illness in the defendant's family, defendant's employment problems, and his incarceration. The evaluation gave defendant's description of the incident for which he was charged as follows:

Patient states that his memory is hazy to the charges for which he was arrested. He states that he went to boss and

asked for his money. He felt that at this time things went out of whack and he told his boss that the boss had made a mistake. The boss told him to return to work. He apparently went out to his van and got his shotgun and came back in and tried to talk with his boss. At first when he came in he stated that he had not been drinking but later he did say that he had been drinking fairly much and that he was drinking at the time. He understood that he told the man that he had found an answer to his problem and that would be to shoot the man.

The evaluation showed defendant had been treated at the hospital with the drugs Haldol and Cogentin. Dr. McRee noted the following at the time of defendant's discharge:

At the present time he seems to be completely recovered from his psychotic episode that was described on admission.

Analysis and Opinions:

In my opinion Mr. Gambrell is capable of proceeding to trial since he understands the nature of his legal situation and is able to cooperate with his attorney. As to responsibility for his actions at the time of the alleged crime I have found no mental defect or mental disorder which would have prevented him from distinguishing right from wrong with respect to the current charge. Patient expresses that he was drinking alcohol at the time that the crime occurred and that his memory is somewhat hazy about what happened. The alcohol was taken on a voluntary basis and therefore does not reduce his responsibility for his actions. It is my impression that the patient probably had an epidose while in jail of alcohol withdrawal syndrome and that this explains his behavior, which included visual and auditory hallucinations and some delusions. These have cleared completely and are no longer present.

Diagnoses:

Axis I: Alcohol withdrawal, delirium, now recovered— 291.00

Axis II: Mixed personality disorder with antisocial passive-aggressive paranoid tendencies—301.89

Axis III: Obesity

Dr. McRee prescribed the drugs Haldol and Cogentin for defendant and recommended that defendant be discharged to the sheriff and "followed by the mental health center or the jail physician until such time that disposition is decided."

On 12 March 1984, the trial court denied defendant's motion for the appointment of psychiatric experts. The court's order recited as grounds for the denial that, according to the Dorothea Dix Hospital Discharge Summary:

[D]efendant was evaluated and . . . had delusions and hallucinations due to alcohol withdrawals. The summary further states that patient no longer shows the delusions and hallucinations which he was experiencing while in jail and at the time of admission. These have cleared completely and are no longer present and there was no evidence presented that would tend to show different findings would or may result from a second evaluation.

On 30 March 1984, defendant, pursuant to N.C.G.S. § 15A-959, filed notice of an intent to raise an insanity defense, but no evidence in support of this defense was offered at trial.

We think *Ake v. Oklahoma*, 470 U.S. 68, 84 L.Ed. 2d 53 (1985), decided after defendant's trial but before his case was argued before us, controls the question presented in favor of defendant's contentions. In *Ake* the holding of the Court was expressed as follows:

We hold that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue, if the defendant cannot otherwise afford one.

470 U.S. at 74, 84 L.Ed. 2d at 60. The Court in *Ake* reversed the Oklahoma Court of Appeals, which had rejected an indigent defendant's argument that he should have been provided the services of a court appointed psychiatrist, and remanded the case for

a new trial, Ake having been convicted and sentenced to death without the assistance of a psychiatric expert.

Both the state and defendant recognize that the principle announced in *Ake* controls the question. The issue resolves itself into whether defendant made "a preliminary showing that his sanity at the time of the offense [was] likely to be a significant factor at trial." *Ake v. Oklahoma*, 470 U.S. at 74, 84 L.Ed. 2d at 60. We think defendant made the necessary preliminary showing.

The state argues defendant did not make the necessary preliminary showing. It relies on that portion of the Dorothea Dix Discharge Summary which recites Dr. McRee's opinion that defendant was capable of proceeding to trial and had no mental defect or disorder which would meet the test of legal insanity. The state relies further on Dr. McRee's "impression" that defendant's behavior, including his visual and auditory hallucinations and his delusions, which had cleared, could be explained by an alcohol withdrawal syndrome.

In determining whether defendant has made the threshold showing required by *Ake*, the trial court should consider all the facts and circumstances known to it at the time the motion for psychiatric assistance is made. It should not base its ruling on the opinion of one psychiatrist if there are other facts and circumstances casting doubt on that opinion. The question under *Ake* is not whether defendant has made a *prima facie* showing of legal insanity. The question is whether, under all the facts and circumstances known to the court at the time the motion for psychiatric assistance is made, defendant has demonstrated that his sanity when the offense was committed will likely be at trial a significant factor.[2]

Had those portions of the Dorothea Dix report relied on by the state been all that was before the superior court when it

2. *Ake* held also that an indigent defendant is entitled to state furnished psychiatric assistance on issues relating to his mental state which may arise at a capital sentencing hearing. Defendant does not argue this point, apparently because Dr. McRee did testify for defendant at the sentencing hearing. In doing so, Dr. McRee testified that he "was not really pleased" with his earlier alcohol withdrawal syndrome diagnosis because defendant "had been in jail for some time, and it was so long for an alcohol psychosis to be occurring." Dr. McRee testified that when defendant entered Dorothea Dix "he was psychotic. He was incompetent at that time."

denied defendant's motion, the state's position would be stronger. There were, however, a number of other important facts before the trial court at the time it ruled on defendant's motion. These were: (1) Physicians at Forsyth County Memorial Hospital on 16 January 1984, after defendant had been placed in custody for approximately ten weeks, determined that defendant was then in need of psychiatric care, treatment and examination. (2) Defendant appeared at that time to be comatose. (3) Defendant had been unable to speak cogently with his counsel. (4) Defendant was incapable of responding to questions posed to him in open court. (5) On admission at Dorothea Dix initial professional impressions were that he suffered from "an acute psychosis, probably schizophrenic in type." (6) Defendant was treated therapeutically with psychotropic drugs which were prescribed for him upon his discharge. (7) Dr. McRee recommended that defendant be followed either at the mental health center or by the jail physician after his discharge. (8) Defendant's own version of the crime as recited in the hospital summary. (9) Defendant's family history of depression and mental illness. All these facts were enough to show, even in the presence of some evidence to the contrary, that defendant's sanity at the time of the crime was "likely to be a significant factor at trial."

Indeed, the facts in the instant case are strikingly similar to those in *Ake*. In *Ake*: (1) Defendant's behavior at arraignment four months after the offense was so bizarre as to prompt the trial court, *sua sponte*, to have him examined for competency. (2) A state psychiatrist then found Ake to be "delusional . . . [and] a probable paranoid schizophrenic . . ." and recommended a psychiatric evaluation to determine Ake's competency. (3) On admission to a state hospital Ake was found not to be competent to stand trial, and a psychiatrist testified at a subsequent competency hearing that Ake was psychotic. (4) Six weeks later after having received the antipsychotic drug, Thorazine, three times daily, Ake was determined to be competent to stand trial, and the state resumed proceedings against him. (5) Oklahoma recognizes the defense of insanity, under which the defendant has the initial burden of producing evidence.

In the instant case: (1) Two months after the shooting, physicians concluded that defendant was in need of psychiatric examination and treatment. (2) Defendant's behavior in open court was

bizarre, and he was ordered to undergo psychiatric evaluation. (3) On admission defendant was experiencing hallucinations and delusions, was suffering from depression and anxiety, and was thought to have an acute psychosis. (4) After being administered the psychotropic drug Haldol in the highest recommended daily dosage, see Physicians' Desk Reference, 39th ed., 1201-1205 (1985), defendant's symptoms were ameliorated, and he was thought to be competent to stand trial and not to be legally insane. (5) North Carolina also recognizes the defense of insanity with the burden on defendant to establish his legal insanity to the jury's satisfaction. *State v. Mize*, 315 N.C. 285, 337 S.E. 2d 562 (1985).

These similarities between the instant case and *Ake* bolster our conclusion that here defendant made the necessary threshold showing in support of his motion for psychiatric assistance.

In summarizing its decision the Court in *Ake* said:

> We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.

470 U.S. at 83, 84 L.Ed. 2d at 66.

It is clear, therefore, that the constitution does not give an indigent defendant the right to choose his own psychiatrist or even to receive funds to hire a private psychiatric expert. We reject defendant's contention that he is entitled to such an independent, privately employed psychiatrist. The appointment of state employed psychiatrists may fulfill the state's constitutional obligation. Their employment by the state, we are satisfied, creates no conflict of interest which would disable them from fulfilling the constitutional requirements.

What is required, as *Ake* makes clear, is that defendant be furnished with a competent psychiatrist for the purpose of not only examining defendant but also assisting defendant in evaluating, preparing, and presenting his defense in both the guilt and sentencing phases. Dr. McRee, the psychiatrist who examined defendant at Dorothea Dix Hospital, was not appointed for this purpose and did not serve in this capacity. Dr. McRee's involvement with defendant, consequently, did not fulfill the state's constitutional obligation as *Ake* expounded it.

Defendant, therefore, must be given a new trial at which the court will appoint some competent psychiatrist for the purpose of examining defendant and assisting defendant in evaluating, preparing, and presenting his defense in both the guilt and sentencing phases.

The verdict and judgment entered against defendant are, therefore, vacated and the case remanded to the Superior Court of Forsyth County for a

New trial.